IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STEVEN MACK, Individually and on Behalf
of All Others Similarly Situated,

        Plaintiffs,

v.

RESOLUTE ENERGY CORPORATION n/k/a
CIMAREX RESOLUTE LLC, NICHOLAS J.
SUTTON, JAMES E. DUFFY, WILLIAM K.
WHITE, GARY L. HULTQUIST, TOD C.
BENTON, THOMAS O. HICKS, JR.,
ROBERT J. RAYMOND, JANET W.
PASQUE, RICHARD F. BETZ, JOSEPH
CITARRELLA, AND WILKIE S. COLYER,
JR.

        Defendants.

Civil Action No. 19-77-RGA

## MEMORANDUM OPINION

Michael Van Gorder, FARUQI & FARUQI, LLP, Wilmington, DE; Nadeem Faruqi and James
M. Wilson, FARUQI & FARUQI, LLP, Wilmington, DE, attorneys for Plaintiffs.

David J. Teklits and Thomas P. Will, MORRIS, NICHOLS, ARSHT & TUNNELL LLP,
Wilmington, DE; Michelle A. Reed and Erin M. Brewer, AKIN GUMP STRAUSS HAUER &
FELD LLP, Dallas, TX, attorneys for Defendants.

March 18, 2020

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before me is Defendants' Motion to Dismiss Consolidated Class Action Complaint. (D.I. 24). I have reviewed the Parties' briefing. (D.I. 25, 26, 27, 28, 29). Because I find that Plaintiffs have not sufficiently pleaded their complaint, I will grant Defendants' motion.

## I.     BACKGROUND

Resolute was an oil and natural gas exploration company that operated in the southern and western regions of the United States. (D.I. 23 at ¶ 40). On November 19, 2018, Resolute proposed a merger agreement with Cimarex, another energy company, according to which Resolute shareholders would have the right to receive a certain amount of consideration. (*Id.* at ¶ 41). Resolute filed a preliminary proxy statement on January 10, 2019. (D.I. 1 at ¶ 3). Plaintiffs and others filed suit on January 14 and 15, 2019. (No. 19-77-RGA, D.I. 1; No. 19-79-RGA, D.I. 1, No. 19-86-RGA, D.I. 1). In connection with the merger, the Resolute board filed a definitive proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC") on January 30, 2019. (*Id.* at ¶ 4; *see* D.I. 25-1, Ex. A). The board reviewed the proxy, which solicited Resolute's shareholders to vote in favor of the merger. (D.I. 23 at ¶¶ 148-51). The proxy contained fairness opinions from financial advisors Goldman Sachs and Petrie Partners. (D.I. 25-1, Ex. A).

On February 14, 2019, Resolute supplemented the proxy with more information and disclosures relating to the merger by filing a Form 8-K. (*Id.* at 3-4, Ex. D at 1). Pursuant to the merger, Resolute shareholders had the right to receive 0.3943 shares of Cimarex common stock, $35 per share in cash, or a combination of $14 per share in cash and 0.2366 shares of common stock subject to proration. (D.I. 23 at ¶ 8). A majority of Resolute's shareholders voted to approve the merger, which closed on March 1, 2019. (D.I. 25 at 3).

The class action complaint on behalf of Resolute shareholders, filed on June 14, 2019, alleges two violations of § 14(a) of the Securities Exchange Act, violation of § 20(a) of the Securities Exchange Act, and breach of fiduciary duty. (D.I. 23).

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6) Standard Generally

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790-91 (3d Cir. 2016).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complainant must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

"Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). I am "not required to credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). A complaint may not be dismissed, however, "for imperfect statement of legal theory supporting the claim asserted." *See Johnson v. City of Shelby*, 574 U.S. 10, 10 (2014).

3

A complainant must plead facts sufficient to show that a claim has "substantive plausibility." *Id.* at 11. That plausibility must be found on the face of the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*; *Twombly*, 550 U.S. at 555-56. Deciding whether a claim is plausible will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

### B. Section 14(a) of the Securities Exchange Act of 1934

Section 14(a) of the Securities Exchange Act prohibits the solicitation of proxies in violation of SEC rules and regulations. 15 U.S.C. § 78n(a)(1). "[Section] 14(a) of the Securities Exchange Act was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 444 (1976).

Rule 14a-9 is "issued pursuant to Section 14(a) of the Securities Exchange Act of 1934." *Nat'l Home Prod., Inc. v. Gray*, 416 F. Supp. 1293, 1312 (D. Del. 1976). Rule 14a-9 provides that no proxy shall be "false or misleading with respect to any material fact," or "omit[] to state any material fact necessary in order to make the statements therein not false or misleading. . . ." 17 C.F.R. § 240.14a-9. To prevail on a § 14(a) claim, a plaintiff must show that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007) (quoting *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (internal quotation marks omitted)).

4

This court has held that the Private Securities Litigation Reform Act of 1995 does not apply to a negligence-based Section 14(a) claim. *See Jaroslawicz v. M&T Corp.*, 2017 WL 1197716 (D. Del. Mar. 30, 2017), *appeal pending*, No. 17-3695 (3d Cir.).[1]

## III. DISCUSSION

Before the merger with Cimarex, Resolute appeared to be well-positioned for financial growth. In 2018, the company reported a 47 percent increase in oil production for Q3 when compared to the previous quarter of that year. (D.I. 23 at ¶ 42). In light of Resolute's financial performance and optimistic prospects, Plaintiffs thus assert that the merger consideration under-compensated Resolute shareholders. (*Id.*). Specifically, Plaintiffs allege that Defendants negligently allowed a materially misleading proxy statement to be disseminated to Resolute's shareholders, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100. (*Id.* at ¶¶ 1, 139-143).

The proxy statement recommended that the shareholders vote in favor of the merger based on internal financial forecasts prepared for the Resolute board of directors and the opinions of the board's financial advisors hired to oversee the transaction. (D.I. 25-1, Ex. A). Plaintiffs contend that the proxy omitted "complete and non-misleading financial projections," which would have alerted shareholders to the fact that the consideration being offered for the merger was inadequate. (D.I. 23 at ¶¶ 43, 50). This, in turn, would have informed shareholders' decisions in voting to approve the merger. (*Id.*). Due to the omissions in the proxy, Plaintiffs argue that it presented a materially incomplete and misleading picture of Resolute's valuation

---

[1] Other courts have come to different conclusions. *See, e.g.*, *In re The Home Depot, Inc. S'holder Derivative Litig.*, 223 F. Supp. 3d 1317 (N.D. Ga. 2016); *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 634 (D. Md. 2010).

5

and financial prospects. (*Id.* at ¶¶ 45-61). As a result, Plaintiffs assert that they were substantially harmed and suffered economic losses of the difference between the merger consideration and the "true and fair value of their shares prior to the merger." (*Id.* at ¶ 44).

Plaintiffs allege that the Proxy violated Section 14(a) of the Securities Exchange Act because: (1) the Proxy contained material non-GAAP[2] financial projections in support of the merger consideration without complying with Regulation G (17 C.F.R. § 244.100); (2) the reliance on and utilization of material unreconciled non-GAAP financial measures by the Defendants and Resolute's financial advisors and the omission of "certain Cimarex projections" rendered statements in the Proxy misleading in violation of SEC Rule 14a-9 (17 C.F.R. § 240.14a-9); and (3) the fairness opinions by Resolute's financial advisors were misleading due to, among other things, the inconsistent use of certain financial measures. (D.I. 23 at ¶ 5). Plaintiffs also allege that the individual board directors breached their fiduciary duties of loyalty and care. (*Id.* at ¶ 11). Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.I. 25).

## A. Material Misrepresentation or Omission

To survive a motion to dismiss at the pleading stage, Plaintiffs must sufficiently plead that the proxy statement contained a "material misrepresentation or omission." *Tracinda Corp.*, 502 F.3d at 228. The Supreme Court has defined a misrepresentation or omitted fact to be

---

[2] Generally Accepted Accounting Principles are a common set of accepted accounting principles, standards and procedures that companies must follow when they report financial statements to the SEC and shareholders. GAAP standards and guidelines are created and maintained by the U.S. Financial Accounting Standards Board ("FASB"). Since the FASB established the GAAP guidelines in 1973, the SEC and the American Institute of Public Accountants have adopted GAAP as the official standards of financial accounting. Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted effectively to exclude amounts that are included in the most directly comparable GAAP measure. 17 C.F.R. § 244.101(a)(1).

6

material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *EP Medsys., Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) (internal quotation marks omitted). "[F]or a misrepresentation or omission to be material[,] there must be a substantial likelihood that the disclosure of the omitted fact [or misrepresentation] would have been viewed by the reasonable shareholder as having significantly altered the total mix of information made available." *Id.* (internal quotation marks omitted). "[I]t is well-established that a material fact need not be outcome-determinative . . . . [T]he information need only be important enough that it 'would have assumed actual significance in the deliberations of the reasonable shareholder.'" *Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991) (quoting *TSC Indus.*, 426 U.S. at 449).

"The omission of information from a proxy statement will violate [§ 14(a) and Rule 14a-9] if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006) (internal quotation marks omitted). "Information regarding a company's financial condition is material to investment." *SEC v. Todd*, 642 F.3d 1207, 1221 (9th Cir. 2011); *see also SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) ("Material facts include those which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities."). The Third Circuit has held, "materiality is a relative concept, so that a court must appraise a misrepresentation or omission in the complete context in which the author conveys it." *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 369 (3d Cir. 1993).

### i. Compliance with Regulation G

Plaintiffs allege, "Defendants violated Regulation G when they disclosed the projected non-GAAP financial measure earnings before interest, taxes, and depreciation ("EBITDA")

7

without disclosing the comparable GAAP financial measure," and failed to reconcile the non-GAAP financial measure with a comparable GAAP financial measure before disclosing these financial projections to shareholders. (D.I. 23 at ¶ 6). Plaintiffs do not agree that a business exemption from Regulation G applies in this case where a corporate registrant is reporting to its investors. (D.I. 26 at 9).

Defendants argue that Regulation G does not apply to the non-GAAP financial measures at issue and therefore no additional disclosure or reconciliation is required. (D.I. 29 at 4; D.I. 25 at 6). Defendants contend that they meet the two requirements that exempt them from compliance with Regulation G: first, the financial measures at issue were provided to Resolute financial advisors so that they "could provide advisory services and opinions 'for the information and assistance of the Resolute board in connection with its consideration of the merger,' and second, those opinions were 'not a recommendation as to how any holder of shares of Resolute common stock should vote or make any election with respect to the merger or any other matter.'" (D.I. 29 at 3, citing D.I. 25-1, Ex. A at 56).

Regulation G has two requirements: (1) a general disclosure requirement, and (2) a reconciliation requirement. 17 C.F.R. § 244.100. Whenever a registrant publicly discloses a non-GAAP financial measure, the registrant must accompany that non-GAAP financial measure with:

(1) [a] presentation of the most directly comparable financial measure calculated and presented in accordance with Generally Accepted Accounting Principles ("GAAP"); and

(2) [a] reconciliation . . . which shall be quantitative for historical non-GAAP measures presented, and quantitative . . . of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP....

*Id.*

8

The SEC has clarified that financial measures provided to a financial advisor in the

context of a merger are exempt from the definition of non-GAAP financial measures and

therefore not subject to Regulation G where:

(1) the company includes the financial measures in forecasts provided to the
financial advisor to render an opinion materially related to the merger
transaction; and

(2) the company discloses the forecasts to comply with Item 1015 of Regulation
M-A or other disclosure laws.

Section 101, Business Combination Transactions, Sec. Com. Discl. 2015 WL 5620589. Item

1015 refers to reports and opinions from an outside party related to the fairness of consideration

to be obtained in a merger transaction. *See* 17 C.F.R. § 229.1015.

Under *Seinfeld*, a failure to comply with specifically required SEC disclosures—like

Regulation G— makes the omission of such information from a proxy statement a violation of

Section 14(a) and Rule 14a-9. 461 F.3d at 369. Therefore, the threshold issue is whether

Regulation G applies to the proxy disclosures made to shareholders. In addition to the proxy

statement language quoted by Defendants and restated above, the proxy states:

Petrie Partners' advisory services and the opinion expressed herein were provided
for the information and benefit of the Resolute board in connection with its
consideration of the transactions contemplated by the merger agreement, and
Petrie Partners' opinion does not constitute a recommendation to any holder of
Resolute common shares as to how such holder should vote with respect to any of
the transactions contemplated by the merger agreement.

(D.I. 25-1, Ex. A at 64). The proxy statement and its supplemental disclosures show that (1) the

financial measures were indeed included in "forecasts provided to the financial advisor to render

an opinion materially related to the merger transaction," and (2) the forecasts were disclosed to

comply with Item 1015. *See* Section 101, Business Combination Transactions, Sec. Com. Discl.

2015 WL 5620589. Thus, I find that Defendants' statements in the proxy qualify under the

business combination exemption and Defendants are exempted from compliance with Regulation

9

G. I will grant the motion to dismiss with respect to Defendants' failure to comply with
Regulation G.

## ii. Whether the proxy statement was materially misleading

Even if Regulation G does not apply, Defendants are not exempted from their obligations
under Rule 14a-9 not to submit materially misleading proxies. *Seinfeld*, 461 F.3d at 369.

Plaintiffs argue that Defendants' use of non-GAAP financial projections, including
EBITDA and "after-cash tax flows," without providing GAAP reconciliations and the line-items
used in creating the projections, is materially incomplete and misleading in violation of SEC
Rule 14a-9. (D.I. 23 at ¶¶ 54-60).

Plaintiffs support their argument for the materiality of the omitted information by
describing the purpose of such financial measures, what those measures signify about merger
consideration, and how experts evaluate the importance of such information. (*Id.* at ¶¶ 95-98,
100-01, 105-13, 118-22). Plaintiffs state that the omitted information would have been material
to shareholders seeking to determine the fair value of Resolute and thus important for
shareholders in making an informed vote about the merger. (D.I. 26 at 9; D.I. 23 at ¶ 10).
Specifically, Plaintiffs assert that the lack of reconciliation or disclosure of the line items used in
calculating the non-GAAP measures rendered the financial forecasts "materially misleading"
because (1) shareholders were unable to "understand the differences between the non-GAAP
financial measures and their respective most comparable GAAP financial measures" (D.I. 23 at ¶
67); (2) shareholders were unable to "compare the Company's financial prospects with similarly
situated companies," (*id.*); and (3) the line-item disclosure would have enabled shareholders
independently to prepare discounted cash flow ("DCF") analyses (*id.* at ¶¶ 95-96).

Plaintiffs contend that Resolute management had a "unique vantage point" that "ma[d]e[]
management's assessment of the Company's future operating and financial performance all but

10

irreplaceable." (*Id.* at ¶ 97). Plaintiffs also argue that non-GAAP projections should have been reconciled and the line items used to calculate these projections disclosed, "especially when the Board relied on these financial measures to solicit votes." (D.I. 26 at 13). Defendants argue that Plaintiffs here have failed to show how the specific omissions they allege would make any possible difference to a reasonable shareholder in deciding how to vote. (D.I. 25 at 9-10). Defendants point to "18 single-spaced pages of disclosures" related to the valuation analyses and other "extensive disclosure" to argue that Plaintiffs have not shown that the additional metrics they seek would have been material to shareholders voting on the merger or how omitting that information rendered the proxy, in whole or in part, misleading. (*Id.*).

"[B]efore something may be materially misleading, it must itself first be a material term." *Stein v. Almost Family, Inc.*, 2018 WL 1440841, at *6 (W.D. Ky. March 22, 2018). The fact that a company's explicit statements in a proxy state that non-GAAP metrics are not, in the company's view, "material," or that they were provided to the financial advisor solely for the purpose of conducting its analysis and issuing its fairness opinion, or that the metrics were not included to influence voting, is not necessarily dispositive in determining materiality. *Cf. id.* ("[A]lthough Almost Family's claim in the Registration Documents that the non-GAAP metrics were not 'material' is likely not dispositive in and of itself, it certainly tips the scales more in favor of the company.").

Plaintiffs' argument that non-GAAP measures are generally viewed with suspicion fails to show that the specific omissions they identify would take on actual significance to a shareholder in determining how to vote. *See TSC Indus.*, 426 U.S. at 449. I do not think that pointing to the use of unreconciled non-GAAP measures, such as EBITDA, on its own, is sufficient to establish that the omission of GAAP measures or reconciliations was a material omission. Plaintiffs' burden is to make a "showing of substantial likelihood that, under all the

11

circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Id.* Plaintiffs' allegations do not support such a conclusion.

Plaintiffs argue that the lack of reconciliation or disclosure of the line items used in calculating the non-GAAP measures rendered the financial forecasts "materially misleading" because shareholders were unable to "understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures," and "compare the Company's financial prospects with similarly situated companies." (D.I. 23 at ¶ 67). Plaintiffs caution that the SEC has heightened its scrutiny of unreconciled, non-GAAP projections and has offered various warnings about considering EBITDA as a financial measure. (*Id.* at ¶¶ 64, 110-13). Defendants acknowledge in the proxy that EBITDA "should not be considered as an alternative to net earnings or other measures derived in accordance with GAAP." (D.I. 25-1, Ex. A at 74).

Plaintiffs cite to several authorities that generally establish the importance of financial projections to support their argument that the underlying information used to create the financial advisors' projections is material information improperly omitted from the proxy. (*Id.* at ¶ 95, n. 25-27). These general statements are not enough. "It is not sufficient that information might prove helpful." *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007). Even if the identified omissions are important, Plaintiffs have not shown that any of the omitted information is "necessary in order to make the statements [in the proxy] not false or misleading." 17 C.F.R. § 240.14a-9(a). While the SEC has noted "a number of troublesome practices which can make non-GAAP disclosures misleading," Plaintiffs here fail to allege how, in this case, the non-GAAP disclosures were misleading. *See* D.I. 23 at ¶ 64.[3]

---

[3] Citing Mary Jo White, Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity,

12

Plaintiffs argue that the omitted information is material because shareholders would find it important to understand Resolute's standalone prospects in deciding whether or not to approve the merger transaction. (*Id.* at ¶ 43). Later in Plaintiffs' complaint, however, they state that the analyses of the financial advisors reflected "[t]he Board's confidence in the Company's prospects," thereby giving some indication that through the proxy and its associated disclosures, shareholders were apprised, at least to some extent, of Resolute's standalone prospects. (*Id.* at ¶ 125). For example, Goldman's analyses resulted in an implied value for Resolute as high as $42.08-44.33 per share (D.I. 25-1, Ex. A at 59, 61) while Petrie's analyses implied equity value for Resolute as high as $61.01 per share, and $45.00 per share were Resolute to perform as a standalone company (*id.* at 66, 70). From the information that was offered in the proxy, it appears that Resolute's shareholders would have been able to compare the company's prospects to those of other companies.

The Third Circuit has held that financial projections attached to a proxy statement "d[o] not stand alone as a statement of affirmative fact," particularly where "their inclusion is accompanied by a lengthy and specific disclaimer." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 501 (3d Cir. 2016) (upholding dismissal of claims challenging projections as statements of fact). The complaint does not specifically identify any false or misleading statements within the financial projections or valuations. While "opinions, predictions and other forward-looking statements . . . may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them," Plaintiffs do not allege facts to suggest that this was the case here. *In re Donald Trump Casino Litig.*, 7 F.3d at 368-69.

---

NonGAAP, and Sustainability (June 27, 2016) (emphasis added) (footnotes omitted), available at https://www.sec.gov/news/speech/chairwhite-icgn-speech.html.

13

Plaintiffs also assert that the lack of reconciliation or disclosure of the line items used in calculating the non-GAAP measures rendered the financial forecasts "materially misleading" because the line-item disclosure would have enabled shareholders independently to prepare discounted cash flow ("DCF") analyses. (D.I. 23 at ¶¶ 9, 96). Plaintiffs assert, "[N]one of the accounting measures actually presented for Resolute in the financial projections included in the Proxy… can be used to determine the unlevered free cash flows needed to prepare a DCF analysis." (*Id.* at ¶ 109). Plaintiffs state this information would also have enabled Resolute's shareholders to "establish the propriety (or lack thereof) of the projected figures" used by the financial advisors in their respective analyses. (*Id.* at ¶ 105).

There is no *per se* rule that financial projections and their underlying financial information are material or must be disclosed. *See Assad v. Digital Globe, Inc*., 2017 WL 3129700, at \*5 (D. Col. July 21, 2017); *Goldfinger v. Journal Commc'ns Inc.*, 2015 WL 2189752, at \*4 (E.D. Wis. May 8, 2015) ("There is no 'per se' duty to disclose financial projections given to and relied on by a financial advisor." (citing *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at \*11 (Del. Ch. June 30, 2014)); *see also Malon v. Franklin Fin. Corp.*, 2014 WL 6791611, at \*6 (E.D. Va. Dec. 2, 2014) ("Courts have consistently held that the duty of disclosure does not extend to the provision of information so extensive and detailed as to permit stockholders to make an independent determination of fair value or recreate the analysis of a financial advisor."). Generally, with respect to data underlying a financial advisor's opinion in a proxy statement of a merger, only a fair summary must be disclosed, meaning that the company "does not need to provide sufficient data to allow the stockholders to perform their own independent valuation." *House v. Akorn*, 385 F. Supp. 3d 616, 620 (N.D. Ill. 2019), citing *In re Trulia, Inc. Stockholder Litig.*, 129 A.3d 884, 901 (Del. Ch. 2016).

14

Plaintiffs cite *Karp v. First Connecticut Bancorp. Inc*, 2019 WL 4643799 (D. Md. Sept. 24, 2019), in which the court denied a motion to dismiss a complaint that, like the complaint filed here, asserted claims under Section 14(a) arising from the solicitation of shareholder votes regarding a proposed merger transaction. Plaintiffs, in that case, alleged that the defendants negligently allowed a proxy to be disseminated to the company's shareholders that omitted material information, namely that they withheld "any form" of the company's after-tax cash flow projections from its shareholders. *Id.* at 3. Since the after-tax cash flow projections were considered the single most important financial metric for valuing a company, the proxy's omission, therefore, painted a misleading picture of First Connecticut's valuation and financial prospects. *Id.* at 8.

Here, Defendants did include after-tax cash flow projections, but Plaintiffs regard the inclusion of those projections as misleading because they were not accompanied by the line-items used to calculate those projections. *See* D.I. 23 at ¶¶ 104-05. The comparison is therefore inapposite. "A fair summary does not require the detail needed for shareholders to independently examine the financial advisor's work." *Ridler v. Hutchinson Tech. Inc.*, 216 F. Supp. 3d 982, 987 (D. Minn. 2016).

Plaintiffs state that the proxy failed to disclose the unlevered free cash flows necessary to calculate the values of both Resolute and Cimarex. (D.I. 23 at ¶¶ 95-103). "In contrast to normal practice[,] . . . the Proxy inappropriately excluded the unlevered free cash flows of Resolute used in" Goldman's and possibly Petrie's analyses. (*Id.* at ¶ 99). "Instead[,] the projections in the Proxy were inappropriately limited to only production[,] . . . revenue, EBITDA and capital expenditures." (*Id.*). It is not readily apparent from the face of the complaint where this assertion fits in Plaintiffs' argument.

Plaintiffs do not explain why these disclosures were "inappropriately limited" such that they rendered the information that was contained in the proxy materially misleading. I agree that it was important for Resolute's shareholders to be able to evaluate the worth of Cimarex stock, particularly as the majority of the merger consideration paid to Resolute's shareholders consisted of Cimarex stock. *See id.* at ¶ 100. I am unconvinced, given the extensive disclosures Defendants made in the proxy, that Plaintiffs plausibly allege that Defendants withheld information about the value of Resolute and Cimarex from Resolute's shareholders or that it was necessary for Resolute's shareholders to have "the pertinent information necessary to determine" the valuations on their own. *See id.*

Plaintiffs do not point to a specific statement in the proxy that was rendered "materially misleading" due to the omission of unlevered free cash flows and the identified omitted line items. Without this specificity, Plaintiffs appear to argue that the exclusion of this information rendered the entire recommendation of the Resolute board of directors materially misleading, as well as the entirety of the financial advisors' analyses as contained in and appended to the proxy.

Even if the omitted information described above would have been material to shareholders in deciding how to vote on the merger, Plaintiffs do not meet their burden for pleading that the omissions rendered the proxy misleading, particularly in light of the other information that was presented in the proxy. Because Plaintiffs have not shown that the complained-of figures are material or that the entire recommendation has been rendered materially misleading as a result of the identified omissions, I do not find that the failure to include GAAP financial measures, GAAP reconciliations, the line-items used to calculate the financial projections, or the unlevered free cash flow information rendered the proxy materially misleading. Consequently, I will grant Defendants' motion to dismiss with respect to the proxy statement.

16

### iii.    Financial advisors' fairness opinions

Plaintiffs allege that the financial advisors' fairness opinions were materially misleading due to their use of multiple measures of historical and projected cash flows. (*Id.* at ¶¶71-78, 84-107). According to Plaintiffs, the results from the financial advisors' analyses appear to produce "discordant results." (*Id.* at ¶90). Plaintiffs cite the fact that Goldman derived a per-share value for Resolute of $22.45-29.87 and Petrie's analysis derived a per-share value of $31.16-38.91. (*Id.*). They also state that the merger consideration involved a "low 14.8% premium, compared to the range of 16.8% to 37.7% observed by Goldman and a median one-day premium of 25% observed by Petrie in comparable transactions." (*Id.* at ¶91). Plaintiffs regard these analyses as pointing to "a heightened need for thorough disclosure and clarity regarding the data and valuation methods" used by the financial advisors. (*Id.*). Even when viewed in light of Resolute's indications of strong financial performance, the facts here do not state enough to allege that the premium or merger consideration was unfair.

Plaintiffs also assert that there are "clearly inadequately explained differences" in the methodologies used by the financial advisors in preparing their opinions. (*Id.* at ¶90). For example, Plaintiffs state,

> It is not readily apparent that the respective definitions of "after-tax cash flows" used by the financial advisors [in their various analyses] are mathematically equivalent to one another, which leaves the possibility that different figures were used by each. If this is true, shareholders should have been apprised of that fact and given the opportunity for a closer examination in order to determine whether one calculation was more suitable than the other for the purpose of valuing Resolute (and Cimarex). Even if this is not true … shareholders should not be left to wonder. Consequently, adequate disclosure regarding "after-tax cash flows" is necessary in this instance not only to facilitate shareholders' ability to independently perform valuation analyses, but also to establish the propriety (or lack thereof) of the projected figures used by Goldman and Petrie.

(*Id.* at ¶105).

In the context of a challenge to the sufficiency of a proxy statement, the Second Circuit in *Resnik v. Swartz* has said, "Disclosure of an item of information is not required... simply because it may be relevant or of interest to a reasonable investor." 303 F.3d 147, 154 (2d Cir. 2002). "[A] shareholder is not entitled to disclosure sufficient to make his own independent assessment of a stock's value. Nor is he entitled to information merely because he believes it would be useful. Rather, he is entitled only to a 'fair summary' of a financial advisor's work." *Calleros v. FSI Int'l, Inc.*, 892 F. Supp. 2d 1163, 1175 (D. Minn. 2012); *see also Goldfinger*, 2015 WL 2189752, at *5 ("Goldfinger's 'tell me more' pleading does not state a Section 14(a) claim because if the standard of materiality were so low, 'not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information[—] a result that is hardly conducive to informed decision making.'") (quoting *TSC Indus.*, 426 U.S. at 448-49).

The law does not require that shareholders be enabled "independently" to perform valuation analyses. *See Calleros*, 892 F. Supp. 3d at 1175. Plaintiffs point to a litany of items that they allege the proxy improperly omitted but do not explain how or why this information would have been important to a reasonable shareholder in deciding how to vote on the merger transaction. As just one example, Plaintiffs state,

> Goldman's *Illustrative Net Asset Value Analysis*, while based on a discount[ed] cash flow methodology, does not indicate whether a terminal value was considered at the end of the 2.25-year forecast period, although it implies that one should be included by mentioning a 4-year development plan for undeveloped reserves and development of additional undeveloped reserves.

(D.I. 23 at ¶ 89). Plaintiffs do not explain why the terminal value at the end of this financial period of this information might have been significant to a reasonable voting shareholder when considering the merger transaction. Plaintiffs also fail to explain why the information that the

18

financial advisors did disclose was insufficient to enable shareholders to assess the propriety of the advisors' analyses and the valuations of the respective organizations. Nor do Plaintiffs specifically allege that the merger premium was too low, unfair, or otherwise actionable. They merely suggest that more information was warranted.

Plaintiffs state in their complaint that the "importance of providing sufficient information to shareholders" is "axiomatic." (*Id.* at 25). While this may be true, I do not find that axioms help here. Plaintiffs have not pleaded with sufficient specificity that the Defendants' alleged failures to provide the information described above rendered the proxy statement materially misleading in violation of Section 14(a) and Rule 14a-9. The proxy includes eighteen pages summarizing the financial analyses provided by the financial advisors, including an explanation of each of the four separate valuation analyses performed by Goldman, and each of the four additional valuation analyses performed by Petrie Partners. (D.I. 25-1, Ex. A at 56-74). The proxy also appends the fairness opinions of both advisors to the proxy, and the Form 8-K provides additional supplements to the disclosure concerning the valuation analyses. *See id.*, Exs. B-D. I agree with Defendants that the proxy and its supplemental disclosures provide at least a "fair summary" of the financial analyses conducted by the advisors. Thus, I will grant Defendants' motion to dismiss as to the fairness opinions.

## B. Loss Causation

Plaintiffs must plead with sufficiency that the proxy statement caused them injury. *See Tracinda*, 502 F.3d at 228. Loss causation requires a showing of "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). A complaint fails to allege loss causation if it does not "provide the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation. . . ." *Id.* at 347.

19

Pursuant to the merger, Resolute shares were valued at $35 per share in cash or a combination of $14 per share in cash and 0.2366 shares of common stock. (D.I. 23 at ¶ 8). While Plaintiffs allege, generally, that the shares were undervalued, they make no statement about the value of Resolute stock prior to the announcement of the merger, nor do they offer any facts or theories about what the value of Resolute stock might have been in any reasonable period after the announcement, had the merger not taken place. The complaint makes no plausible allegation that Resolute shares would have been trading at above $35 at any such time.

Plaintiffs assert that "failure to remedy the deficient Proxy and consummating the [merger] directly and proximately caused" an undervaluation of shares which resulted in shareholders receiving less than the true value of their investment. (D.I. 23 at ¶ 80). Plaintiffs contend that economic harm arose from the proxy's omissions and misrepresentations of the projected financial performance of Resolute and Cimarex, which then bore directly on the valuation of the stock of both companies, in turn influencing the value of the merger consideration. (*Id.* at ¶¶ 50-51, 59, 80, 85, 134, 146).

As a general matter, loss causation requires some comparison between what did happen and what would have happened but for the alleged wrong. Here, Plaintiffs' theory is (and, I think, must be) that if the material omissions had not occurred, the shareholders would have voted the merger down. Thus, the shareholders would have retained their Resolute stock. The stock would have had a market value at the relevant time, which is March 1, 2019. Plaintiffs allege nothing about what the market value would have been on March 1, 2019 (or any other date). It would be difficult to make a good faith allegation that the market value on March 1, 2019 was greater than $35 per share.

First, while it is nowhere stated in the complaint, public sources show that Resolute stock was trading at about $30 per share immediately before the merger was announced in November

20

2018.[4] Pursuant to the merger, Resolute shares were valued at $35 per share in cash. Thus, the

merger consideration was about 15% greater than the value the market placed on Resolute stock

at the time of the merger announcement.

Second, as a theoretical matter, the merger consideration is usually going to be greater

than the market value or actual value of the shares without consideration of the merger. This is

because of the so-called "merger premium."

> The current merger movement has been characterized by the willingness of the
> management of some acquiring companies to pay substantial merger premiums.
> A merger premium exists when the common stockholders of an acquired
> company receive cash and/or securities possessing a value greater than the
> company's premerger market value. The rationalization or justification of these
> "premiums" is based on a merger synergy concept. Contemporary merger
> literature recognizes two broad forms of merger synergy – the potential for greater
> operating efficiencies and/or potential financial benefits . . . .

Nielsen, A Financial Analysis of Acquisition and Merger Premiums, J. Fin. & Quantitative

Anal., Vol. 8, No. 2, at 139 (1973).[5]

Thus, while it may reasonably be possible to allege that the merger consideration should

have been greater than it was (and this is the basis for Delaware's appraisal statute, *see infra* note

7) and it may even be possible to speculate that at some undetermined time in the future, the

stock would appreciate enough to exceed what was given in the merger, it is virtually impossible

to plausibly allege that if the merger had been voted down, Resolute stock would have been

trading at over $35 per share (or close to that) on March 1, 2019. In the context of the federal

securities statutes at issue in this case, a plaintiff cannot say that the merger consideration should

have been greater than it was, and that shortfall is the measure of the harm, because to do so then

---

[4] Shanti S. Nair and Debroop Roy, *Cimarex to pay $1.6 billion for fellow Permian firm Resolute*,
REUTERS, Nov. 19, 2018, https://www.reuters.com/article/us-resolute-energy-m-a-cimarex-
energy/cimarex-to-pay-1-6-billion-for-fellow-permian-firm-resolute-idUSKCN1NO1CW.
[5] Merger premiums and "merger synergy" continue to exist. *See In re Appraisal of Panera
Bread Co.*, 2020 WL 506684, at *35-40 (Del. Ch. Jan. 31, 2020).

would mean that it was not the material omission that caused the harm, but that the failure of Resolute to negotiate a better deal was the cause of the harm.

While Federal Rule of Civil Procedure 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," the "short and plain statement" must give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Plaintiffs here fail to satisfy this pleading requirement. Plaintiffs state:

> 123. The Merger Consideration was inadequate in light of the Company's financial performance and future prospects at the time of the Transaction. Indeed, shortly before announcing the Transaction, the Company reported a 47% increase in oil production for Q3 2018 when compared to Q2 2018. The Company further reported that: "Third quarter 2018 adjusted EBITDA (a non-GAAP measure as defined and reconciled below) was \$67.7 million, more than double second quarter 2018 adjusted EBTIDA of \$33.7 million and up 58% from the prior year quarter."

> 124. It is clear that the Board was very optimistic about the future potential of the company and the stock was undervalued. The Proxy notes that in the August 1, 2018 Board meeting, the Company expected "significant production growth" in its drilling, which the Board believed was not reflected in the Company's stock price. Proxy 42. In the October 11, 2018 press release, Defendant Betz was quoted as saying: "As expected, our 2018 development program has begun to pay in dividends in the form of significantly increased production and cash flow." The press release also noted "improving industry conditions."

> 125. The Board's confidence in the Company's prospects was reflected in the analyses conducted by Goldman Sachs and Petrie Partners. Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis* resulted in an implied present value of Resolute Energy as high as \$44.33 per share, while the *Premia Analysis* calculated an implied value for Resolute Energy as high as \$42.08 per share. Proxy at 59, 61. Petrie's *Discounted Cash Flow Analysis* implied an equity value for Resolute Energy as high as \$61.01 per share, while the *Going Concern Analysis*, which specifically looked at the potential performance of Resolute Energy as a standalone company, calculated an implied equity value as high as \$45.00 per share. *Id.* at 66, 70.

> 126. In sum, it is clear that Resolute was well-positioned for financial growth, and that the Merger Consideration failed to adequately compensate the Company's shareholders. The Proxy's material omissions and misrepresentations of the projected financial performance of Resolute bears directly on the undervaluation of the outstanding common units by underinformed voters, and the fairness of the Merger Consideration.

> 127. The Merger Consideration was not fair or adequate and shareholders have been harmed by being forced to relinquish their shares for less than their true worth.

(D.I. 23 at ¶¶ 123-27).

The Resolute board's statements and other indicators of strong past performance described in the complaint are untethered to Plaintiffs' allegations of loss causation. Plaintiffs do not offer any notice of what the relevant economic loss might have been. *See Dura Pharm.*, 544 U.S. at 347. Plaintiffs allege in the complaint that the premium used for the merger consideration was low, but they do not explain how the information omitted from the proxy (or anything else, for that matter) would have led to the market valuing Resolute stock significantly higher than it had theretofore done, thereby resulting in an economic loss to the shareholders.

The Supreme Court in *Dura Pharmaceuticals* rejected an approach that would allow recovery wherein a misrepresentation led to an inflated purchase price but nonetheless did not proximately cause any economic loss. 544 U.S. at 346. Here, we have the opposite situation, in that Plaintiffs have alleged that the sales price of Resolute stock in the merger has been too low. But Plaintiffs do not state, and are unable plausibly to state that, had the shareholders retained their Resolute stock without a merger, the market value of their shares would have been greater than $35 per share.

The financial analyses of Goldman Sachs and Petrie Partners detailed in the proxy statement, as described in paragraph 125 of the complaint,[6] do not support an assertion that Resolute shares would have been trading at above $35 at the time of the merger. Goldman Sachs' *Illustrative Net Value Analysis* "implied an illustrative range of net asset values per Resolute common share from $25.35 to $33.49." (D.I. 25, Ex. 1 at 59). Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis* "resulted in a range of implied present values of (i) $8.99 to $19.72 per share of Resolute common stock using 2019 EBITDA estimates and (ii)

---

[6] There is some irony in Plaintiffs alleging materially misleading omissions and then writing a paragraph in the complaint citing nothing but the top of the ranges in the financial analyses.

23

\$28.12 to \$44.33 per share of Resolute common stock using the 2020 EBITDA estimates." (*Id.*).
Goldman Sachs' *Premia Analysis* "indicated a range of illustrative premia of 16.8% to 37.7%"
and an "illustrative range of implied prices per share of Resolute common stock of \$35.67 to
\$42.08." (*Id.* at 61). In its *Discounted Cash Flow Analysis*, Petrie Partners evaluated four
scenarios in which the principal variable was oil and gas prices to determine per share equity
reference value ranges from \$21.50 to \$61.01. (*Id.* at 66). Petrie Partners also analyzed the
potential standalone financial performance of Resolute and determined "a composite per share
equity reference value range of \$30.00 to \$45.00 per share of Resolute common shares." (*Id.* at
70).

     The pleading here is not very different than that in *Dura*, in which the complaint failed to
provide the defendants "with notice of what the relevant economic loss might be or of what the
causal connection might be between that loss and the misrepresentation." 544 U.S. at 347; *see
also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n.4 (3d Cir. 2006). Under *Dura*,
economic loss here must mean not some hypothetical loss between the true value post-merger, or
even the day of the merger, and the merger consideration, but the difference compared to what
shares would have actually been trading for in the absence of the merger. *See Trahan v.
Interactive Intelligence Grp., Inc.*, 308 F.Supp.3d 977, 1000 (S.D. Ind. 2018) ("[A]pproval of the
Merger can only have proximately caused economic loss if the shareholders' hope [that the
company would prove more valuable than the merger consideration implied] would have been
*realized...*"). References to optimistic prospects do not allege economic loss. As such, Plaintiffs
have not pleaded facts that offer a plausible theory of loss causation. Plaintiffs have failed to
provide Defendants with "some indication of the loss and the causal connection that the plaintiff
has in mind." *See Dura Pharm.*, 544 U.S. at 347.

The securities statutes, including Section 14(a) of the Exchange Act, do not exist to "provide investors with broad insurance against market losses," but seek to maintain public confidence in the marketplace through good corporate governance. *Id.* at 345.[7] "[A]llowing a plaintiff to forgo giving any indication of the economic loss and proximate cause would bring about the very harm the securities statutes seek to avoid," namely, the abusive practice of filing lawsuits with only a "faint hope" that discovery might lead to some plausible cause of action. *Id.* at 347.

## C. Transaction Causation

Finally, to survive a motion to dismiss at the pleadings stage, Plaintiffs must prove transaction causation. *Tracinda*, 502 F.3d at 228. "Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if . . . he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970). The Third Circuit has expressed the "essential link" component between the proxies at issue and the harm they have alleged as requiring plaintiffs to establish that their alleged injury resulted from a transaction directly authorized by the proxy solicitation. *In re NAHC, Inc. Sec. Litig.*, WL 1241007, *22 (E.D. Pa. 2001), *aff'd*, 306 F.3d 1314 (3d Cir. 2002). Transaction causation is commonly understood to mean reliance. *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988).

Inasmuch as Plaintiffs have failed to demonstrate that the proxy contained materially misleading representations or omissions in violation of Rule 14a-9 and that these

---

[7] Plaintiffs do not find themselves entirely without recourse. Under Delaware law, there is an appraisal rights procedure for determining the true value of shares. *See* 8 Del. C. § 262. *See, e.g., In re Appraisal of Panera Bread Co.*, 2020 WL 506684 (Del. Ch. Jan. 31, 2020).

misrepresentations or omissions caused economic loss to the shareholders, I need not reach the

issue of whether transaction causation has been sufficiently pleaded.

## D. Section 20(a) of the Securities Exchange Act

Plaintiffs allege that Defendant directors acted as controlling persons within the meaning

of Section 20(a) of the Exchange Act and are liable under Section 20(a) due to their positions.

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision
> of this chapter or of any rule or regulation thereunder shall also be liable jointly and
> severally with and to the same extent as such controlled person to any person to whom
> such controlled person is liable . . . unless the controlling person acted in good faith and
> did not directly or indirectly induce the act or acts constituting the violation or cause of
> action.

15 U.S.C § 78t(a). A claim for controlling person liability under § 20(a) must, therefore, be

based upon a primary violation of the securities law. *In re Rockefeller*, 311 F.3d at 211. Because

Plaintiffs do not adequately plead a Section 14(a) violation, Plaintiffs' Section 20(a) claim

necessarily fails.

## E. Breach of Fiduciary Duty

As I have dismissed Plaintiffs' federal claims, I will decline to exercise supplemental

jurisdiction over Plaintiffs' claim for breach of fiduciary duty under Delaware law. (D.I. 23 at ¶

11).

## IV. CONCLUSION

For the reasons stated above, I will dismiss Plaintiffs' Section 14(a) and Section 20(a)

claims, with leave to amend.[8] I will dismiss Plaintiffs' claim of breach of fiduciary duty. An

accompanying order will be entered.

---

[8] I note that Plaintiffs did not request leave to amend, but I nevertheless give them the
opportunity if they conclude they can successfully replead.